**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Timothy S. CURRY, Samuel T. Harding, Don J. Leinenbach, Robert Holland and Roger S. Curry, Defendants–Appellants.**

Nos. 91–2550, 91–2556, 91–2578, 91–2579 and 91–2586.

United States Court of Appeals, Seventh Circuit.

Argued May 21, 1992.[*]

Decided Sept. 24, 1992.

Rehearing and Rehearing In Banc Denied Oct. 23, 1992 in Nos. 91–2578 and 91–2579.

Rehearing and Rehearing En Banc Denied Oct. 28, 1992 in No. 91–2586.

---

[*] Case number 91–2586, Roger Curry's appeal, was not argued but was submitted on the record and briefs.

Melanie Conour (argued), C. Joseph Russell, Asst. U.S. Attys., Office of U.S. Atty., Indianapolis, Ind., for U.S.

Roger S. Curry, pro se.

Spiros P. Cocoves (argued), Toledo, Ohio, for Robert C. Holland.

Glenn A. Grampp (argued), Evansville, Ind., for Don J. Leinenbach.

Michael J. McDaniel (argued), New Albany, Ind., for Samuel T. Harding.

Robert Canada, Evansville, Ind., Daniel C. Hale, Miller, Hale & Harrison, Boulder, Colo., James W. Lawson (argued), Oteri, Weinberg & Lawson, Boston, Mass., for Timothy S. Curry.

Before CUMMINGS and FLAUM, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

CUMMINGS, Circuit Judge.

A jury found defendants Timothy Curry ("Tim"), Roger Curry ("Roger"), Don Jeffrey Leinenbach, and Samuel T. Harding guilty of conspiracy to manufacture and possess with intent to distribute in excess of fifty kilograms of marijuana in violation of 21 U.S.C. § 846. Tim, Roger, and Harding were also found guilty of manufacturing in excess of fifty kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1). The jury found defendant Robert Holland guilty of making false declarations before a federal grand jury in violation of 18 U.S.C. § 1623. The defendants raise a number of issues regarding the propriety of their convictions and sentences. We affirm.

## I.

Co-conspirators Mary Lynch and Brenton Long provided the details surrounding the defendants' conspiracy to manufacture and possess with intent to distribute marijuana. Long testified at trial for the government under a grant of immunity. Defendant Lynch pleaded guilty pursuant to a plea agreement limiting her prison term to no more than three years, and was obligated to testify under the agreement.

In late 1982, Lynch and Long helped Tim and his wife, defendant Joyce Curry (who has not appealed from her conviction), and others hang marijuana to dry in the basement of Tim's Niwot, Colorado, residence. After the marijuana was dry, Lynch "manicured" (prepared) some of it for sale, earning $10.00 per hour from Tim. Tim told her that the marijuana came from Indiana.

In the spring of 1983, Tim hired Lynch and Long to help clone marijuana plants in his residence. After Tim taught them how to clone the plants, they (primarily Long) produced approximately 2,500 new marijuana plants from thirty to fifty mother plants. Long agreed to work for Tim in transporting, planting, and harvesting the marijuana. Tim, Long, defendant Holland and another individual brought the new marijuana plants first to Nebraska, where they planted 500 of the plants, and then to Jasper, Indiana. In Jasper, Long met Tim's brother, Roger, and Long, Tim, Roger, and Holland subsequently planted the remaining 2,000 plants on defendant Leinenbach's farm in Otwell, Indiana. Long met and had conversations with Leinenbach in the spring of 1983, but Leinenbach did not participate directly in any of the planting activity. The spring planting was completed by June 21, 1983.

A person named "Rich Kelly" was mentioned on numerous occasions during trial. Testimony at trial indicated that Kelly is a fictional character created by the defendants to take blame for their marijuana growing, although at least some of the defendants apparently still contend that he is an actual person. A "Rich Kelly" purchased a farm in Velpen, Indiana, from the Jasper State Bank in September 1983. According to the Bank's president Joseph Miller, Roger vouched for Kelly, stating that he had known Kelly since boyhood. Miller testified that the real estate transaction with Kelly was "highly unusual" because no financial statement, credit report, or employment verification of Kelly was ever done. A checking account was opened in Kelly's name which listed Roger as the person who would know Kelly's location. In addition, Lynch testified that she, Tim, Roger, and Holland discussed the use of a fictitious person named Kelly during the summer of 1985. Lynch also testified that the continued use of a "Richard Kelly" as a scapegoat was discussed by Holland, Joyce, and herself in 1987, and by Tim and herself

in 1989. In the spring of 1983, Tim had asked Long to play the role of Rich Kelly, in whose name certain property in Indiana was to be purchased, but Long refused.

During the fall of 1983, Long, Roger, Tim, and Holland harvested marijuana at Leinenbach's farm. To avoid detection, the marijuana was harvested at night while Leinenbach harvested the surrounding corn crop. The harvested marijuana was transported to the Velpen farm where it was hung to dry. When the marijuana was dry, Tim, Roger, Long, and Joyce packed it into over 100 boxes. At Tim's request, Long drove 56 of the boxes to Colorado. The boxes were eventually stored at Tim's home. The marijuana was transferred over a period of time to Lynch's home in Boulder, Colorado, where Lynch and others manicured it for sale in late 1983 and early 1984. Approximately 1,000 pounds of finished marijuana were produced for sale. Tim told Long that he (Tim) had made over one million dollars between the 1983 marijuana project and a "spec house" that he had built.

In May 1984, an electric company employee discovered hundreds of small marijuana plants growing in containers near the Velpen farmhouse. In June 1984, Roger asked Dennis Mehringer to estimate the cost of plumbing repairs at the Velpen farmhouse. Merhinger was introduced to a Richard Kelly at the farmhouse. Around September 1984, defendant Steven Bush (who was found not guilty at trial) showed Jeff Griffith where marijuana was growing at Leinenbach's farm. Griffith returned to Leinenbach's farm and stole marijuana at least three times in 1984. Bush told Griffith that the people who were growing the marijuana included Roger and Holland. In the fall of 1984, Tim again asked Lynch to manicure some of the marijuana from Indiana. She and others processed approximately 250 to 300 pounds of saleable marijuana in Colorado. Tim indicated that this was only part of the harvest.

In the spring of 1985, "Richard Kelly" purchased a farm in rural Martin County, Indiana, from Mark and Cindy Hewitt. The closing was attended by "Kelly," Tommy and Thelma Crane, Mark and Cindy Hewitt, and two realtors. Mark Hewitt identified Tim as the person who introduced himself as Kelly at the closing. One of the realtors and Thelma Crane reaffirmed their previous selections of Tim's photograph as Kelly, although neither could make a certain in-court identification. Thelma Crane noted that Kelly's hair was shorter and he did not have glasses. Lynch had earlier testified that Tim's hair was darker than usual and that he had not worn glasses previously. One of the previous residents at the Martin County farm testified that she saw Tim and Roger walking around the farm twice before the sale of the farm, and that Tim's hair had been lighter and he was not wearing glasses. Another previous resident also identified Tim as one of the two persons at the farm. This resident saw Roger at the farm after it was sold, and talked to Tim and defendant Samuel Harding. A neighbor also saw Harding at the Martin County farm.

In the summer of 1985, Tim offered Lynch $15,000 to come to the Martin County farm and "weed" marijuana because Harding had hurt his back. Lynch agreed and came to Jasper, where she met Holland and went to Roger's law office to get keys to the Martin County farm. She saw the marijuana growing room at the Velpen farmhouse while she was in Indiana, and helped Roger clean the house. During her visit, Holland helped Lynch weed around the marijuana plants, Tim gave her money for expenses, and Roger visited her.

Harding's former wife, Joan Hylinski, testified that Harding went to Jasper, Indiana, in May 1985, telling her that he was going to help some friends on a farm. In July of that year, Hylinski traveled to Jasper and stayed with Harding for approximately 10 days at the Martin County farm, helping Harding pull weeds from the marijuana fields there. Hylinski also went to Leinenbach's farm with Harding and Roger where they inspected the marijuana plants. Hylinski, Harding, and Roger transplanted marijuana plants in the growing room of the Velpen farmhouse.

In September 1985, Lynch, Tim, Roger, Harding, Holland, and one other person harvested the marijuana at the Martin County farm. Lynch acted as a lookout for the operation. She also assisted Tim, Harding, and others with the preparation of the barn for harvest, including putting plastic on the floors, stringing twine between the walls, cutting a ventilation hole in the side of the barn, and getting a large propane heater to dry the marijuana. When the marijuana from the Martin County farm was hung to dry, Tim, Roger, Harding, and Holland went to harvest Leinenbach's farm. They returned, however, and said the marijuana had been stolen.

To avoid discovery by police, the harvesters dismantled the growing room at the Velpen farm. The valuable items were returned to Colorado, as were some marijuana plants and some dried marijuana from the Martin County farm. During the cleanup of the Velpen farmhouse, Lynch used the central vacuum system at the house, but the bag was never emptied. Lynch returned to Colorado, where she and others manicured marijuana for approximately one month, producing about 250 pounds of saleable marijuana. Lynch sold some of this marijuana and observed Tim sell a "large portion" of it in late 1985. Tim paid Lynch $10,000 in cash and marijuana for her part in the undertaking.

In October 1985, Jeff Griffith told police about the marijuana operation and took police officers to Leinenbach's farm and the Velpen farm. Police officers found approximately 2,500 to 3,000 cut marijuana stalks among the corn plants and approximately 97 marijuana plants at Leinenbach's farm. At the Velpen farm, officers found personal documents related to Roger and Holland, high-intensity light fixtures, horticultural literature, handwritten notes regarding plant care, watering pipes, shears, and marijuana, including some found in the bag from the house's central vacuum system.

Also in October, Tim told Lynch that he was going to clean out the Martin County farm. Apparently before he was able to do so, police officers located the farm from documents found at the Velpen farmhouse and found approximately 5,000 cut marijuana stalks amid corn plants, noticed twine strung in the barn, and found personal documents relating to Lynch and Hylinski.

In 1987, at Tim's request, Lynch cloned approximately 250 marijuana plants for Tim and another 500 or so marijuana plants for Roger. In October 1988, Tim delivered approximately 900 pounds of marijuana to Lynch for manicuring.

On September 8, 1989, Holland appeared before a federal grand jury for the Southern District of Indiana pursuant to a grant of formal immunity. Roger, Tim, and Long were targets of the grand jury's investigation. Holland testified under oath that he had no knowledge that Roger, Tim, or Long were involved in the marijuana operation. After the indictment in this case was returned in September of 1990, Holland met with Lynch and attempted to give her a copy of the indictment with notes written on it, requesting Lynch to conform any statements she made to authorities to the notes.

An indictment was returned on September 13, 1990, charging Tim, Roger, Joyce, Don Jeffrey Leinenbach, Lynch, Charles E. Leinenbach, Harding, and Bush in Count I with conspiracy to manufacture and possess with intent to distribute in excess of fifty kilograms of marijuana, from about March or April 1983 through at least October 31, 1985. Count II alleged that Don Jeffrey Leinenbach's farm was forfeitable to the United States. Count III charged Tim, Roger and Harding with manufacturing in excess of fifty kilograms of marijuana in or about October 1985. Counts IV through VI charged Holland with making false declarations before the federal grand jury. Counts VII and VIII charged Roger with filing false federal income tax returns. A second superseding indictment was returned on February 19, 1991.

Lynch entered a plea of guilty pursuant to a plea agreement, and the remaining defendants pleaded not guilty. The district court severed Counts VII and VIII relating to Roger's alleged filing of false income tax returns. Trial began on February 25,

1991. At the end of the government's case, the court granted Charles E. Leinenbach's motion for judgment of acquittal. On April 6, 1991, the jury found all defendants guilty of all counts except Bush, who was found not guilty. Jeff Leinenbach's property was found to be forfeitable. Tim and Roger were each sentenced to 20 years with three years parole; Harding was sentenced to serve 12 years with three years parole; Jeff Leinenbach was sentenced to serve 18 months; and Holland was sentenced to serve 78 months.

## II.

The defendants raise a number of issues, and all adopt issues raised by their co-defendants as applicable. Unless otherwise mentioned, the issues discussed below apply to all defendants.

A. *Joinder of Holland's Perjury Counts*

Defendants argue that Counts IV through VI of the superseding indictment, relating to Holland's perjury before the grand jury in 1989, were improperly joined with Counts I through III, which dealt with a marijuana conspiracy from 1983 to 1985. Rule 8(b) of the Federal Rules of Criminal Procedure provides that:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. * * * [A]ll of the defendants need not be charged in each count.

"Rule 8 is construed broadly to allow liberal joinder and thereby enhance the efficiency of the judicial system." *United States v. Isaacs*, 493 F.2d 1124, 1158 (7th Cir.1974), certiorari denied, 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146. Joint trials are beneficial because they increase court efficiency, limit inconvenience to witnesses, and avoid delays in bringing defendants to trial. *United States v. Sophie*, 900 F.2d 1064, 1083 (7th Cir.1990), certiorari denied, ─── U.S. ───, 111 S.Ct. 124, 112 L.Ed.2d 92. Joint trials may also be beneficial in presenting the "total story" to one

jury, as opposed to bits and pieces of a story being presented to several juries. *Id.*

Nevertheless, in order to avoid undue prejudice, under Rule 8(b) multiple defendants may be tried together only if their charged conduct arose from the "same act or transaction" or the "same series of acts or transactions." Acts or transactions are considered part of the "same series" if they are performed pursuant to a common scheme or plan. *United States v. Velasquez*, 772 F.2d 1348, 1353 (7th Cir.1985), certiorari denied, 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323. We decide this question based on the allegations in the indictment, not on the evidence adduced at trial. *Id.* at 1354 ("Rule 8 on its face is about pleading rather than proof, and there are practical reasons for maintaining the distinction").

The joinder of Holland's perjury counts with the other defendants' conspiracy counts was proper under Rule 8(b). Holland is prominently mentioned in the "overt acts" section of the superseding indictment as an unindicted coconspirator in the marijuana growing enterprise. Most pertinently, it is alleged that Holland and several of the defendants discussed the creation of a fictional character to be known as "Richard Kelly." Holland's perjury counts quote the statements that he made before the grand jury which indicate that Rich Kelly was the leader of the conspiracy. Although the indictment could have been clearer in spelling out the link, we think that the perjury counts sufficiently communicate that Holland's statements before the grand jury were made pursuant to a preconceived plan to cover up the identity of the conspirators. A conspiracy and its cover-up are considered parts of a common plan. *Velasquez*, 772 F.2d at 1354. Finally, the main allegation of perjury against Holland relates to his statements that Long, Tim, and Roger were not involved in the marijuana conspiracy. Therefore joinder is proper here because proof that these statements were false required proof of Long's, Tim's, and Roger's involvement in

the marijuana conspiracy, so that there is considerable overlap of evidence.[1]

The defendants argue that the conspiracy counts and the perjury counts were not part of a common plan because the perjury occurred almost four years after the end of the conspiracy alleged in Counts I and III. Counts may be joined under Rule 8(b) even if they could not have been charged as one conspiracy. *Sophie*, 900 F.2d at 1084. Indeed, several courts have specifically held that perjury counts may be considered part of the same series of acts or transactions as the underlying conduct which was misrepresented. *Isaacs*, 493 F.2d at 1159; *United States v. Swift*, 809 F.2d 320, 322 (6th Cir.1987); *United States v. Moeckly*, 769 F.2d 453, 465 (8th Cir.1985), certiorari denied, 475 U.S. 1015, 106 S.Ct. 1196, 89 L.Ed.2d 311; *United States v. Dekle*, 768 F.2d 1257, 1261–1262 (11th Cir.1985).[2] The number of years between the end of the alleged conspiracy and the subsequent alleged perjury is in our view irrelevant.

Defendants' argument that the district court should have exercised its discretion to sever the counts relating to Holland pursuant to Rule 14 is also without merit.[3] "[S]evere prejudice is required for an order of severance and the trial judge's refusal to sever is rarely reversed." *Velasquez*, 772 F.2d at 1352. Holland is the only defendant who specifically argues that he was unduly prejudiced by joinder here for the purposes of Rule 14. We conclude that no defendant was unduly prejudiced, however. Holland only argues that the jury would have been confused and prejudiced by the numerous allegations in the indictment and the testimony regarding Holland's role in the conspiracy. But if his trial were severed, this testimony would have been relevant and admissible to show that he committed perjury. Furthermore, although evidence relating to Holland's perjury may not have been admissible in a separate conspiracy trial, there was no severe prejudice because Holland's grand jury testimony did not directly implicate any of the other defendants. Therefore the district court correctly denied defendants' motion to sever Holland's perjury counts.

### B. *Exclusion of Expert Testimony Regarding Eyewitness Identification*

The first in a number of evidentiary objections made by defendants relates to the decision by the district court to exclude the expert testimony of Dr. Elizabeth Loftus, a recognized authority on the issue of eyewitness identifications. Expert testimony is generally admissible under Federal Rule of Evidence 702 if it "will assist the trier of fact to understand the evidence or to determine a fact in issue * * *." However, "a district judge has broad discretion to exclude relevant evidence that is confusing or redundant" under Federal Rule of Evidence 403. *Krist v. Eli Lilly and Co.*, 897 F.2d 293, 298 (7th Cir.1990). For the reasons given below, we conclude that the district judge did not abuse his discretion here.

Dr. Loftus' testimony was offered to rebut the testimony of several witnesses who identified Tim, Roger, or Harding around the time of the purchase of the Martin County farm. In particular, Thelma Crane

---

1. The defendants argue that the district court erred by finding only a "logical relationship" between the conspiracy counts and the perjury counts. It is true that a mere "logical relationship" between counts cannot support the joinder of multiple defendants in a single trial. The district court here, however, specifically noted that "Holland is alleged to have been involved in the conspiracy * * *. It is about this very conspiracy which defendant Holland is alleged to have provided false testimony during the grand jury proceeding." Timothy Curry's Br.App. at 22.

2. The defendants rely on *United States v. Grey Bear*, 863 F.2d 572 (8th Cir.1988), where an equally divided *en banc* court affirmed the district court's decision to allow joinder. We believe that the facts in that case (which is without precedential value) are distinguishable in that the government did not allege any conspiracy.

3. Rule 14 of the Federal Rules of Criminal Procedure provides in pertinent part that:

 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

testified that she met a person introducing himself as Rich Kelly at the Martin County closing. She identified a photograph of Tim Curry as Rich Kelly about three years later. At trial, about six years after the closing, she was unable certainly to identify Tim as Kelly. Mark Hewitt was also present at the closing and identified Tim as Kelly at trial. Cynthia Hawkins testified that around the time of the closing, she saw on two different occasions two men examine the Martin County farm where she lived. At trial she identified Tim and Roger as these two men. Cynthia's husband Robert Hawkins testified that he talked to two men at the Martin County property in the spring of 1985. At trial he identified Tim and Harding as the men he had seen. Hewitt, Cynthia Hawkins, and Robert Hawkins all viewed photograph arrays and had identified photographs on one or more occasions before trial.

Dr. Loftus would have testified on a number of issues relating to the accuracy of these identifications. Among the propositions discussed in her offer of proof that are arguably beyond the understanding of an average person are: 1) witnesses invariably overestimate the duration of their observation of an individual; 2) a witness' confidence in his identification bears little or no relationship to the accuracy of the identification; 3) memory fades at a geometric rather than an arithmetic rate; 4) "post-event phenomena" may distort or supplant original memory, and memory is easily distorted by leading questions or other manipulations; 5) prior photographic identifications increase the likelihood that later in-person identifications will be erroneous; and 6) social alcohol and marijuana use hinders the ability of an individual to retain information.

The district court entered a written order denying the admissibility of Dr. Loftus' testimony, concluding that:

[S]uch testimony may be properly excluded where the testimony addresses an issue of which the jury is generally aware. In the present controversy the jury was questioned during *voir dire* about recall and the ability to identify persons they had seen only briefly, or had not seen for a period of time. Additionally, all of the witnesses who identified defendants were thoroughly cross examined about the reliability of their identification, the length of time they saw the defendant, the conditions under which they saw the defendant, the length of time which elapsed between the witness seeing the defendant and the photos or the defendant in person, the number of times the witness saw the photo arrays, and when the witness was shown the photo array. Thus, the jury was made aware of many of the factors which may effect [sic] perception, retention and recall. * * * Thus, although the jury may not understand the intricacies of perception, recall and retention, the jury is generally aware of the problems with identification.

Government's Br.App. at 7. The district court's focus on what the jury is "generally aware" of could be a finding that Dr. Loftus' testimony would not assist the trier of fact under Rule 702, or it could be considered a finding that her testimony would be unduly confusing or a waste of time under Rule 403.[4] As has been noted, "The Rule 702 analysis * * * incorporates to some extent a consideration of the dangers, particularly the danger of unfair prejudice, enumerated in Fed.R.Evid. 403." *United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir.1985). The "helpfulness factor" under Rule 702 involves consideration whether the expert testimony would be misleading or confusing in the context of the trial. See *id.* at 1237.

Dr. Loftus' testimony may not have been totally unhelpful; as the court noted, most persons do not understand the intricacies of perception, retention, and recall. The district court also apparently had no quarrel with her competency to testify or with the reliability of her scientific testimo-

4. In an oral decision to deny reconsideration of his earlier written order, the district judge explicitly stated that the basis of his ruling was *both* Rule 702 and Rule 403. Tr. at 2503.

ny.[5] We conclude, however, that the district court's decision to exclude Dr. Loftus' testimony was a proper exercise of its discretion, whether under Rule 702 or Rule 403. The eyewitness testimony was far from the only evidence against the defendants. Indeed, as noted above, the bulk of testimony came from two government witnesses and co-conspirators, Brenton Long and Mary Lynch. The testimony of Joan Hylinski was also important. Although the eyewitness testimony bolstered the government's theory that there was no real Rich Kelly, it can fairly be described as minor and amounted to only one day in a four-week trial. The intrusion of an expert to comment on this minor testimony was not necessary, especially when the record reveals that vigorous cross-examination by the defendants exposed the weakness of the identifications.

In addition, the defendants gave the government only four days' notice of their intent to call Dr. Loftus. The Third Circuit held that it was not an abuse of discretion to exclude expert testimony when only five days' notice of a proposed proffer was given. *United States v. Dowling*, 855 F.2d 114, 118 (3d Cir.1988), affirmed, 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708.

Defendants' reliance on our decision in *Krist* is misplaced. In *Krist*, we specifically noted that "in routine cases the trial judge is not required to allow wide-ranging inquiry into the mysteries of human perception and recollection." 897 F.2d at 298. *Krist* was not a routine case because it involved an individual's recollection of the color of pills she took forty years ago. Our case, on the other hand, *is* routine—the identifications were not of pills and took place no more than six years after the events in question. Although it is likely that it was within the discretion of the trial court to allow the eyewitness expert testi-

mony here, we decline to hold that the court was required to do so.

C. *Sufficiency of the Evidence/Multiple Conspiracy Challenges*

 The defendants challenge the sufficiency of the evidence to support the finding that each participated in a single, ongoing conspiracy to manufacture and possess with an intent to distribute marijuana. Their challenge is sometimes styled as an allegation that the evidence at trial showed only multiple conspiracies, not a single conspiracy, and that there was therefore a fatal variance between the indictment and proof. In addition, they assert as unlawful the district court's decision not to give a multiple conspiracy instruction.

We initially reject the defendants' argument that the district court was required to give a multiple conspiracy instruction. The defendants cite *United States v. Kendall*, 665 F.2d 126, 136 (7th Cir.1981), certiorari denied, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140, where we stated that "if the possibility of multiple conspiracies exists, the trial judge must so instruct the jury." We have carefully limited this statement in more recent cases. In *United States v. Townsend*, 924 F.2d 1385, 1410 (1991), we noted that "[t]he failure to give a proposed multiple conspiracy instruction cannot, then, be error unless the defendants demonstrate that they have been prejudiced by the variance itself." Similarly, in *United States v. Grier*, 866 F.2d 908, 934 (1989), we stated that "[w]hile the district court could properly have instructed the jury on the possibility of multiple conspiracies, it was not required to do so." These cases teach that the lack of a multiple conspiracy instruction is simply one of several factors to be considered when deciding if a defendant has been prejudiced by a variance. Thus the district court did not err by fail-

---

5. Although we make no specific assertion as to its reliability or general acceptance, a number of cases indicate that Dr. Loftus' field of study is now well accepted. See *Krist*, 897 F.2d at 296–297 (specifically citing work by Loftus); *United States v. Moore*, 786 F.2d 1308, 1312 (5th Cir. 1986) ("The scientific validity of the studies con-

firming the many weaknesses of eyewitness identification cannot be seriously questioned at this point."); *United States v. Smith*, 736 F.2d 1103, 1107 (6th Cir.1984) (suggesting that eyewitness expert testimony is generally accepted), certiorari denied, 469 U.S. 868, 105 S.Ct. 213, 83 L.Ed.2d 143.

ing to give a multiple conspiracy instruction.

Before examining the sufficiency of the evidence with regard to particular defendants, we briefly delineate some basic principles of conspiracy law. "A conspiracy consists of a combination or confederation between two or more persons formed for the purpose of committing, by their joint efforts, a criminal act." *United States v. Mealy*, 851 F.2d 890, 895 (7th Cir.1988) (citations omitted). The essence of a conspiracy is an agreement; to join a conspiracy is to join an agreement, not a group. *Townsend*, 924 F.2d at 1390.

"It is the nature and scope of the agreement that is the determinative factor in distinguishing between single and multiple conspiracies." *United States v. Sababu*, 891 F.2d 1308, 1322 (7th Cir.1989). Multiple conspiracies exist when there is no agreement toward a common goal, and each conspirator's agreement constitutes an end unto itself. *United States v. Paiz*, 905 F.2d 1014, 1020 (7th Cir.1990), certiorari denied, —— U.S. ——, 111 S.Ct. 1319, 113 L.Ed.2d 252. However, it is clear that the participants in a conspiracy need not know all the other members or participate in every aspect of the conspiracy. *Id.* at 1323. Indeed, the whole point of a conspiracy, and the reason why it is punished separately as a crime, is to enable several persons to cooperate and split duties in order to facilitate the object of the conspiracy. *Townsend*, 924 F.2d at 1394.

In evaluating a sufficiency of the evidence challenge, we review the evidence in the light most favorable to the government. If any rational jury could have found the defendant guilty beyond a reasonable doubt, the conviction will be affirmed. *United States v. Burrell*, 963 F.2d 976, 987 (7th Cir.1992). We require "substantial evidence that a particular defendant knew of the illegal objective of the conspiracy and agreed to participate in its achievement." *Id.* Because of the secretive nature of conspiracies, a formal agreement need not be proven. A jury may infer an agreement based solely on circumstantial evidence regarding the relationship of the parties and their overt acts. *Mealy*, 851 F.2d at 896.

It should be stressed that the conspiracy alleged in this case is not a complex distribution scheme encompassing wholesalers, middlemen, and retailers, nor is it one where persons who are arguably competitors (such as competing retailers) are alleged to be co-conspirators because of occasional cooperation. Instead, this case involves a conspiracy to manufacture and possess with an intent to distribute marijuana. In other words, the common purpose of the defendants in this case is clear—to grow marijuana and make money selling it. Cf. *Burrell*, 963 F.2d at 989 ("In the instant case, however, it is easier to establish mutual benefit and cooperation because the defendants were acting as a single economic unit—large-scale purchasers of narcotics.").

We reject an argument that the proof at trial showed three separate conspiracies each lasting one year. The defendants point to evidence that certain defendants explicitly agreed to work for one year, and that some defendants were paid for work done in a particular year. Defendants' argument is based on a fundamental misunderstanding of conspiracy law. Parties may join or withdraw from a conspiracy at any time without altering the fundamental nature of the conspiracy. *Sababu*, 891 F.2d at 1322. Furthermore, the fact that certain parties were paid for a year's work is only of marginal relevance. It would be artificial to divide a conspiracy to grow marijuana into several conspiracies simply because marijuana growing is seasonal in nature. Here, a core group of persons grew marijuana in the same general area over a number of years. A farmer does not start anew his or her farming business every year when the new crops are planted—it is the same farming business as the one initially started.

We now turn to an examination of the evidence, viewed in the light most favorable to the government, relating to each defendant (except Holland, who was not convicted on a conspiracy count) in order to

determine if it supports a joining of the conspiracy alleged here.

### 1. Timothy S. Curry

Tim makes no specific argument that the evidence is insufficient to support a finding that he joined the conspiracy. Indeed, the evidence strongly suggests that he was the leader of the conspiracy, and the other defendants point to him in this regard. There is no need to recount the numerous facts that support the jury's verdict as to Tim.

### 2. Samuel T. Harding

 Harding states that he "was engaged as an employee of the conspiracy and his agreed duties were limited to tending the marijuana plants and participating in the harvest." Harding Br. at 8. We agree that the record supports this characterization, except for the suggestion that these duties were in any sense limited. Harding is apparently arguing that only "managers," and not "employees," are considered members of a conspiracy. An "employee" of a conspiracy, however, is in fact a participant in the conspiracy, since the employee has agreed to perform certain duties in furtherance of the conspiracy and because the employee materially benefits from the success of the conspiracy.[6]

Harding stresses his role as a "manufacturing employee" because he thinks the evidence cannot support the finding that he agreed to join any conspiracy to *distribute* marijuana. Count I of the indictment charged a conspiracy "to manufacture, and possess with intent to distribute marijuana, a Schedule I Non–Narcotic Controlled Substance, in a quantity of greater than fifty (50) kilograms." It would seem that manufacturing with the intent to distribute marijuana implies possession with an intent to distribute, since the cultivation of marijuana necessarily encompasses its possession.[7] In any event, Harding was involved not only with the harvesting of the marijuana but also with the drying and cultivating of the marijuana. The record, when read in a light favorable to the government, supports the conclusion that Harding joined the conspiracy and agreed to its underlying goals, which obviously included the distribution of marijuana at a profit.

Harding wisely does not argue that he should not be considered part of the alleged conspiracy because he did not join it until 1985. As has been noted, a party may join a conspiracy at any time during its life span.

### 3. Roger S. Curry

 Roger, an attorney, suggests that he did no more than act as legal counsel to some of the defendants. Roger's hands are literally much dirtier than that. In 1983, he and others planted around 2,000 plants at Leinenbach's farm. He was also involved in harvesting, drying, and packing the marijuana at Leinenbach's farm. In 1985, the evidence indicates that Roger inspected the marijuana plants at Leinenbach's farm, transplanted marijuana plants at the Velpen farmhouse, and harvested the marijuana at the Martin County farm and was prepared to harvest the marijuana at Leinenbach's farm.

This evidence, standing alone, would support the jury's conclusion that he joined the conspiracy alleged. Roger's argument that he only agreed to two smaller, stand-alone conspiracies in 1983 and 1985 has already been rejected. Even if Roger withdrew from the conspiracy in 1984 and rejoined the next year, his conspiracy conviction is

---

6. Arguably, a more appropriate distinction is not between employee and manager, but between employee and independent contractor (unlike employees, independent contractors are not considered part of the organization for which they work).

7. It appears that the government crafted the indictment in this manner to avoid a possible statute of limitations problem. Federal criminal charges, unless otherwise specifically provided by law, must be brought within five years after the offense was committed. 18 U.S.C. § 3282. The original indictment here was returned on September 13, 1990, very close to five years from the end of the conspiracy alleged in the indictment (October 31, 1985). There is substantial evidence to support a finding that the 1985 harvest was in process after September 13; it is undisputed, however, that this marijuana was manicured for distribution ("possessed") after that date.

sustainable. Although not necessary, the record supports the conclusion that Roger did not withdraw from the conspiracy in 1984. In that year, Roger asked a plumbing contractor to go to the Velpen farm house for a repair estimate. There is also hearsay testimony (the admissibility of which is discussed below) that Roger was involved with the 1984 operation at Leinenbach's farm. In sum, the conspiracy conviction against Roger is supported by substantial evidence.

### 4. Don Jeffrey Leinenbach

 The government's case against Leinenbach is arguably the weakest. Leinenbach owned the farm where marijuana was grown in 1983, 1984, and 1985. It is also apparent that he knew of and supported the growing of marijuana on his farm. For example, he harvested the corn on his farm at night at the same time others were harvesting marijuana. He also had a number of conversations with the other defendants in this case that indicated his awareness of the marijuana-growing, including conversations where the best method of harvesting the marijuana was discussed. There is no evidence, however, that he participated in the harvesting, manicuring, or distribution of the marijuana.

We conclude that there is substantial evidence that Leinenbach joined the conspiracy as alleged. The jury was entitled to infer that Leinenbach was compensated for giving up a portion of his land, which could have been used to grow corn, to allow the other defendants to grow marijuana. This is especially true since Leinenbach allowed the marijuana-growing to occur for at least three years. The opposite inference would call for an unusual amount of generosity on Leinenbach's part.

### D. *Admissibility of Hearsay Evidence/Application of the Bruton Rule*

Roger's brief identifies, in a somewhat confusing manner, testimony that he be-lieves is unlawfully admitted hearsay. The other defendants adopt Roger's arguments, but some of them are applicable only to Roger. The discussion below is aimed at Roger but applies to all defendants as necessary. Roger objects to the following testimony:

### 1. Jeffrey Griffith's Statements

 Government informant Griffith testified that Bush told him in 1984 that he (Bush) was working for people who had marijuana for him to sell and also told him that the main person was Roger Curry. Griffith also testified that in 1985 Bush told him that "those guys" were hiding marijuana from him, and that those guys included Roger Curry. The district court allowed this testimony as admissions against penal interest under Federal Rule of Evidence 804(b)(3).[8] Roger does not argue that Bush's statements do not meet the requirements of this rule; rather, he argues that the statements relating to his involvement in the conspiracy should have been redacted or otherwise not allowed in as evidence. In its order, the district court decided that all of Bush's statements could come in, except that under Rule 403 there could be no reference to Roger as the "ringleader." The court also noted that the jury would be instructed that the testimony was admissible only against Bush.

We recently examined the relationship between the Confrontation Clause of the Sixth Amendment and Rule 804(b)(3) in some detail in *United States v. York*, 933 F.2d 1343 (7th Cir.1991), certiorari denied, —— U.S. ——, 112 S.Ct. 321, 116 L.Ed.2d 262. York was on trial for mail fraud and arson. Two associates of York's partner (who was killed in the fire) testified at trial that she had told them of a plan concocted by York and herself to blow up the business and collect the insurance pro-

---

**8.** This rule provides in relevant part that:

A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

ceeds. *Id.* at 1360. This testimony was allowed in without redaction pursuant to Rule 804(b)(3). Faced with a confrontation clause challenge, we initially stated that the confrontation clause question and the Rule 804(b)(3) question were really one question, not two:

> To be admissible under rule 804(b)(3), then, the inculpatory portion of a statement against interest must be sufficiently reliable to satisfy the confrontation clause. There seems little reason to treat the requirement of reliability differently in each context. Such an approach would be needlessly complex, requiring two bodies of case law where one will do.

*Id.* at 1361. The decision in *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476, was not considered dispositive, since the ruling in that case rested upon the *inadmissibility* of the inculpatory confession against the defendant. *Id.* at 1362. We concluded that there is no need to redact the inculpatory portion of hearsay admitted under Rule 804(b)(3) as long as that portion is closely related to the incriminatory portion of the statement and the other requirements of Rule 804(b)(3) are met. *Id.* at 1364.

The facts in this case are similar to those in *York*, and we likewise affirm the district court's decision to allow all portions of Griffith's statement in as evidence. As in *York*, the statements by Bush to Griffith were not made in an attempt to curry favor with law enforcement officers but were made to an acquaintance. "[T]he advisory committee used that scenario as an example of an inculpatory statement that 'would have no difficulty in qualifying' for admission under 804(b)(3)." *Id.* at 1363. Be-cause they were sufficiently reliable, Bush's inculpatory statements were admissible under Rule 804(b)(3) and did not violate Roger's rights under the Confrontation Clause.[9]

## 2. Holland's Grand Jury Testimony

█ Roger also objects to the reading of Holland's grand jury testimony to the jury, claiming again that his rights under *Bruton* are implicated.[10] We disagree.

Holland's grand jury testimony was not facially inculpatory of any defendant. Indeed, the intent behind the government's perjury charge was to show that Holland was *lying* when he denied on numerous occasions Roger's and Tim's involvement in the marijuana manufacturing conspiracy and instead placed the blame on Rich Kelly. Roger points out that Holland admitted before the grand jury that he was friends with Roger and Tim, and that Roger had visited him at the Velpen farm house on up to ten occasions, and that Roger had lent him money. Contrary to Roger's assertions, these statements *would not have supported* a jury verdict against him. Instead, we agree with the government that "Holland's grand jury testimony did no more than put the government to its proof that Tim, Roger and Long were participants in the conspiracy as charged." Plaintiff's Br. at 26.

Because Holland's grand jury testimony does not directly implicate any other defendant, "the *Bruton* rule does not come into play." *United States v. Briscoe*, 896 F.2d 1476, 1501 (7th Cir.1990), certiorari denied, —— U.S. ——, 111 S.Ct. 173, 112 L.Ed.2d 137. The fact that Roger asked

---

**9.** We decline Roger's invitation to overrule *York*, based on his reading of *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638; *Vincent v. Parke*, 942 F.2d 989 (6th Cir.1991); and *United States v. Gomez–Lemos*, 939 F.2d 326 (6th Cir.1991). Our decision in *York* is not inconsistent with *Wright*, which indeed was discussed in *York*. The Sixth Circuit cases are clearly distinguishable, in that one involved inculpatory statements made to a police officer and the other involved Rule 804(b)(5), not Rule 804(b)(3).

Griffith violated the court's order against referring to Roger as the ringleader when he testi-fied that Bush told him that Roger was the "main person." The district court did not abuse its discretion when it denied Roger's motion for a mistrial and instead cautioned the jury that the statements of Bush may only be held against him and not any of the other defendants.

**10.** The district court instructed the jury to consider the grand jury testimony only against Holland. At Roger's request, the jury was instructed to consider it with respect to his case also. It was not to be considered against or for any other defendant.

the jury to consider the transcript as to him supports a conclusion that it was not facially incriminatory to him. In addition, any statements that become incriminatory only when linked with other evidence do not fall under the *Bruton* rule. *Id.* at 1503. Thus Leinenbach's claim that Holland's statement regarding an "Otwell" farm incriminated him fails because it depends on evidence that Leinenbach was the owner of the Otwell farm.

### 3. Holland's Post–Conspiracy Statement

■ Lynch testified that Holland told her after the first indictment came down that the government had made a mistake in indicting one of the people, who had not even lived in Indiana. Roger's *Bruton* challenge to this testimony, based on the fact that the jury knew he was from Indiana, fails for the same reason as his challenge to Holland's grand jury testimony. Simply put, Holland's statement does not directly incriminate Roger. At best, the statement objected to exculpated one of the defendants who was not from Indiana. But that does not mean that the remaining defendants are thereby incriminated. Since no defendant is specifically mentioned, and it is not obvious that any particular defendant is being singled out as being guilty, Roger's *Bruton* challenge to this statement is without merit.

### 4. Admission of Other Hearsay Under Rule 801(d)(2)(E)

■ In scattershot fashion, Roger argues that a number of statements were erroneously admitted under Federal Rule of Evidence 801(d)(2)(E), which defines as non-hearsay statements made by co-conspirators within the scope of the conspiracy. Under Rule 801(d)(2)(E), "a statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is not considered hearsay. To the extent that Roger's argument rests on the proposition that the proof at trial showed multiple conspiracies and not one single

conspiracy, it fails for the reasons stated above.

Roger objects to a number of hearsay statements that occurred either before the beginning of the alleged conspiracy or after its end, contending that these statements do not fall within Rule 801(d)(2)(E). It is true that such statements could not be in furtherance of a conspiracy not in existence, and thus were not admissible under Rule 801(d)(2)(E). However, the statements were not admitted on the basis of that rule. Instead, it is clear that the statements were admitted pursuant to Rule 801(d)(2)(A) as admissions of party opponents.[11]

■ In general, Roger complains that the limiting instructions regarding Rules 801(d)(2)(A) and 404(b) evidence were incomplete. Specifically, Roger complains that no contemporaneous limiting instructions were given regarding evidence of 1982, 1987, and 1988 marijuana-cultivating endeavors. The comments by the district judge at trial regarding this evidence were somewhat confusing, and failed to distinguish clearly between Rule 801(d)(2)(E) statements applicable to all defendants and Rule 801(d)(2)(A) statements applicable only to the person making the statement. For example, the district court stated at one point:

> [If] the witness says that one of the defendants told them something, it only applies to that particular defendant and it doesn't implicate the rest of them. These eight people here are separate * * * and if that defendant makes a statement or allegedly makes a statement and a witness testifies, you can only consider that evidence to that particular defendant and none other, unless it implicates another defendant. You can judge it based upon what they testify to and don't take that and use it to try to implicate the rest of the defendants.

Tr. at 1392. The phrase "unless it implicates another defendant" seems to contradict the rest of the instruction and caused

---

11. One hearsay statement objected to by Roger related to concealment activity begun while the conspiracy was still on-going and was thus admissible under Rule 801(d)(2)(E). *United States v. Doerr,* 886 F.2d 944, 951 (7th Cir.1989).

Roger's counsel at trial to object again (the nature of the objection is not on the record, but this is the only part of the instruction not favorable to the defendants). A similar confusing contemporaneous instruction is in the record.

We conclude that any erroneous comments to the jury do not warrant reversal of the convictions. Detailed testimony by Lynch and Long spelled out the involvement of the various defendants in the conspiracy, the existence of which is corroborated by substantial physical evidence. In addition, the final instructions given to the jury lessen the impact of any error here. Instruction Number 34 stated that:

> You have heard evidence of acts alleged against several defendants other than those acts alleged in the indictment. You may consider this evidence only on the question of intent, preparation, plan, knowledge, absence of mistake, or accident. This evidence is to be considered by you only for these limited purposes, and only as to the defendants against whom it was offered.

Instruction Number 44 contains similar language. The judge recognized that his extemporaneous comments were not particularly helpful, and specifically told the jury on several occasions that they would be receiving final instructions in which matters would be clarified. Viewing the record as a whole, therefore, we conclude that the district court committed no reversible error.

### E. *Leinenbach—Statute of Limitations*

■ Leinenbach argues that he should have been dismissed from the case because there is no evidence to support a finding that he committed an overt act in furtherance of the conspiracy after September 13, 1985, and therefore the five-year statute of limitations was not satisfied as to him (see *supra* note 7). Leinenbach misstates the law. The government is not required to prove any overt acts with regard to a particular defendant within the limitations period; instead, the government is required

to prove that the conspiracy existed into the limitations period and that the defendants did not withdraw before that period. *United States v. Read*, 658 F.2d 1225, 1232–1233 (7th Cir.1981). Leinenbach has not met his initial burden to produce some evidence of withdrawal, *id.* at 1234, and therefore no error has been committed.[12]

### F. *Arguments Raised by Holland*

#### 1. Conviction

■ Holland raises two specific objections to his conviction. He first contends that the district court was required, under the Due Process clause in the Constitution, to inquire specifically whether he was knowingly and intelligently waiving his right to testify at trial. We have rejected this identical claim on numerous occasions. See, *e.g.*, *United States v. Brimberry*, 961 F.2d 1286, 1289–1290 (1992); *United States v. Thompson*, 944 F.2d 1331, 1345 (1991), certiorari denied, —— U.S. ——, 112 S.Ct. 1177, 117 L.Ed.2d 422. Holland does not give a persuasive reason for overruling these cases. Holland also claims error in that the second superseding indictment, returned less than a week before trial, changed certain dates relevant to him from 1984 to 1983. Holland does not rebut the government's assertion that these were clerical errors of which Holland should have been aware, and does not explain why he .was prejudiced by the amendment. Therefore his claim of error is without merit.

#### 2. Sentence

■ Holland also raises a number of issues regarding his sentence, which was calculated in accordance with the Sentencing Guidelines. He first argues that the district court erred by denying him a two-point reduction for acceptance of responsibility under Guidelines Section 3E1.1. Holland suggests that Judge Brooks did not properly exercise his discretion but rather "reject[ed] his plea out of hand" (Holland's

---

**12.** Similarly, application of 21 U.S.C. § 853, which was enacted on October 12, 1984, to Leinenbach does not create any *ex post facto* con-
cerns because there is no evidence that he withdrew from the conspiracy before that date.

Br. at 10). The record rebuts this contention. Judge Brooks accepted and evaluated both written and oral statements from Holland. The judge made specific findings that Holland did not voluntarily withdraw from his criminal activities in a timely fashion; he did not provide voluntary assistance to officials; and he stated that he felt "pressured." Holland's App. at 57–58. Holland's brief on appeal states that "it cannot be said with certainty that Mr. Holland is entitled to a reduction" (Holland's Br. at 10). Yet it is only when it *can* be said with certainty that acceptance of responsibility has been shown that reversal of a district court's denial is warranted. Judge Brooks' findings are not "without foundation," see *United States v. Delgado*, 936 F.2d 303, 308 (7th Cir.1991), certiorari denied, — U.S. ——, 112 S.Ct. 972, 117 L.Ed.2d 137; § 3E1.1, app. note 5, and we therefore affirm the district court's decision to deny Holland credit for acceptance of responsibility.[13]

Holland also argues that his due process rights were violated because the judge made a finding regarding the number of plants involved in the conspiracy under a preponderance of evidence standard, rather than submitting the question to the jury under a reasonable doubt standard. This Court has rejected this claim, however, *United States v. McNeese*, 901 F.2d 585, 605 (1990); *United States v. Reynolds*, 900 F.2d 1000, 1003–1004 (1990), and we decline to revisit the question at this time, especially since Holland did not raise this issue in the district court.[14]

Finally, Holland claims that he was illegally sentenced as an accessory after the fact under Sections 2J1.3(c)(1) and 2X3.1 of the Guidelines, because as a principal in the marijuana-growing conspiracy he could not also be sentenced as an accessory. *United States v. Huppert*, 917 F.2d 507 (11th Cir.1990), is cited as authority for this proposition. Huppert was convicted of two counts of obstructing justice in connection with the investigation of a money-laundering scheme in which he was engaged, and was sentenced pursuant to Section 2J1.2(c)(1), which like Section 2J1.3(c)(1) contains a cross-reference to Section 2X3.1. The court concluded that Huppert could not be sentenced as an accessory after the fact because he was protecting himself, not others, and it was clear that he was a principal in the money-laundering scheme. *Id.* at 510–511. See also *United States v. Pierson*, 946 F.2d 1044 (4th Cir. 1991) (affirming district court's decision not to apply Section 2X3.1 where defendant was convicted of perjury but acquitted of the substantive underlying offense; defendant obviously perjured to protect himself). Holland's case is different than *Huppert* and *Pierson*, because he was clearly trying to protect others, and not himself—he was immunized for his testimony, and thus had no reason to protect himself. We conclude that the analysis in those cases has no relevance here.[15]

### G. *Non–Guidelines Sentencing Objections*

The other defendants received non-guideline sentences, since the conspiracy of

---

**13.** Holland's sentence was also enhanced for obstruction of justice under Section 3C1.1, because of his attempt to mold Lynch's testimony to be consistent with his grand jury testimony. Holland argues that "he merely attempted to determine the extent of her knowledge in the conspiracy and what information would be expected to be contained in her testimony." It was appropriate for the judge to reject this spin on the facts.

Application note 4 of Section 3E1.1 states that application of the obstruction of justice section "ordinarily indicates that the defendant has not accepted responsibility for his criminal conduct. There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 apply." There is nothing exceptional about Holland's case, again supporting the dis-

trict court's decision to deny him credit for acceptance of responsibility.

**14.** In the case relied upon by Holland, *United States v. Rigsby*, 943 F.2d 631 (6th Cir.1991), certiorari denied, — U.S. ——, 112 S.Ct. 1269, 117 L.Ed.2d 496, the court followed its own precedent and declined to hold that the jury must pass on the question of the number of plants involved in the narcotics conviction, although it expressed dissatisfaction with having to reach that result.

**15.** Holland does not raise on appeal the issue whether it was proper to sentence him as an accessory after the fact for an offense for which he had received immunity against his will, an issue he argued at sentencing.

which they were convicted ended in October 1985, before the adoption of the Guidelines. Roger and Harding raise issues regarding their sentences. Because neither claims that the sentences imposed were outside the statutory limit, the sentences will not be vacated "unless the sentencing judge relied upon improper considerations or unreliable information in exercising his discretion or failed to exercise any discretion at all in imposing the sentence." *Briscoe*, 896 F.2d at 1519. We now examine their claims of error.

### 1. Roger Curry

 Roger was sentenced to 10 years under Count I, 10 years under Count III, to be served consecutively, and a special parole term of three years.[16] He argues that the court relied on "inaccurate information and erroneous assumptions" in deciding a proper sentence. We have carefully reviewed the record and conclude that the supposed errors are either taken out of context or were clearly not the basis for the court's ruling. For example, Roger argues that there is no evidence that he had a "special skill" which was used in connection with the purchase of the Velpen property. However, the district court specifically stated that "I don't think it would fit under special skills. I am not going to consider that in the sentencing in this matter." Roger's App. at 25. Other comments by the judge that may have been erroneous were in fact made in a question-and-answer fashion, and were not in the nature of findings.

Roger also contends that the district court "improperly" exercised its discretion for failing to consider mitigating factors, giving him consecutive sentences, blindly accepting government testimony, and handing out grossly disparate sentences for the various defendants. These arguments are without merit. First, Judge Brooks considered as a mitigating factor a number of letters he received from Roger's clients, and also noted that he was a skilled and hard-working attorney. Roger notes on appeal that he had no prior record, had the possibility of rehabilitation, showed remorse, and supported a wife and two children. However, there is no indication that the judge did not read the presentence report or consider these factors. We cannot hold that a district court erred simply because it did not mention every mitigating factor listed in the report, especially when they were not mentioned by Roger or his counsel at sentencing. It was also permissible for the district court to hand down consecutive sentences for Counts I and III. *United States v. Cerro*, 775 F.2d 908, 910 (7th Cir.1985). Finally, we find that the judge adequately supported the different sentences the various defendants received; indeed, we find the judge's version of the equities more plausible than Roger's proffered version.[17] In summary, the district court did not abuse its discretion in sentencing Roger.[18]

Finally, Roger argues that the district court failed to comply with Federal Rule of Criminal Procedure 32(c)(3)(D), which states that:

> If the comments of the defendant and the defendant's counsel or testimony or other information introduced by them allege any factual inaccuracy in the presentence investigation report * * *, the court shall, as to each matter controverted, make (i) a finding as to the allegation, or (ii) a determination that no such finding is necessary because the matter con-

---

**16.** He was also sentenced to serve three years for his income tax violations, to be served concurrently with his 20–year sentence under Counts I and III, after pleading guilty to severed Counts VII and VIII.

**17.** To cite one example, Roger states that Harding was equally culpable with himself even though Roger was involved for three years and Harding was involved only in 1985.

**18.** Roger also argues that Holland's guideline sentence was improper, and that his sentence

was improperly compared to Holland's. Holland's sentence was affirmed above, so this argument has no merit. Roger argues that Holland's sentence was invalid because the sentencing court used the number of plants as opposed to the dry weight of the marijuana in arriving at Holland's base offense level. Even assuming Roger has standing to make this argument (which was not advanced by Holland), it fails on the merits. *United States v. Haynes*, 969 F.2d 569 (7th Cir.1992).

troverted will not be taken into account in sentencing.

Roger points to three alleged Rule 32 errors. The first related to an allegation of Roger's special skills, which, as noted above, the district court specifically found would not be considered in sentencing. Apparently Roger's argument is that the allegation of special skills has not been totally expunged from his presentence report, as the district court ordered. Since it has offered to ensure that the corrections have been made, we direct the United States Attorney's Office for the Southern District of Indiana to do so. Roger's second argument relates to a statement in the presentence report that he obstructed justice by filing a lawsuit against a government witness. Again, the district court agreed with the substance of Roger's criticisms, and held that the characterization of Roger's lawsuit as an "obstruction of justice" was not a "fact" but a legal conclusion, and ordered Roger's interpretation of the suit to be included in the presentence report. Finally, with regard to the pounds of marijuana involved, the district court indicated that it would not consider that information in its sentencing decision, in accordance with part (ii) of Rule 32(c)(3)(D).

### 2. Samuel T. Harding

Harding was sentenced to consecutive 6–year terms under Counts I and III, with a special parole term of three years with regard to Count III. Harding's arguments about the propriety of his sentence are not materially different than Roger's arguments, and fail for the reasons noted above. It should be noted that his attempt to compare his sentence to Lynch's, who entered into a plea agreement, is without merit, because her plea was conditioned on the express promise that her sentence not exceed three years.

### III.

For the foregoing reasons, the convictions and sentences of all defendants are affirmed.