7 F.3d 238
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Francisco MENDOZA-DELGADO, also known as Jose Delgado, also
known as Regino C. Gonzales, Defendant-Appellant.
 Nos. 91-3370, 92-1249.
 United States Court of Appeals, Seventh Circuit.
 Argued Feb. 18, 1993.
Decided Sept. 3, 1993.
 
 Before COFFEY and ROVNER, Circuit Judges, and ESCHBACH, Senior Circuit Judge.
 
 ORDER
 
 1
 A jury convicted defendant Francisco Mendoza-Delgado of conspiracy to distribute five or more kilograms of cocaine in violation of 21 U.S.C. §§ 846 and 18 U.S.C. § 2; aiding and abetting a Travel Act offense, in violation of 18 U.S.C. §§ 2 and 1952(a)(3); and aiding and abetting the commission of possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The district court sentenced Mendoza-Delgado to life imprisonment without parole pursuant to 21 U.S.C. § 841(b)(1)(A). Mendoza-Delgado appeals his conviction and sentence. We affirm.
 
 I. BACKGROUND
 
 2
 Mendoza-Delgado's ("Mendoza") indictment arose from his participation in a cocaine distribution scheme involving codefendants Gregorio Castillo-Pineda ("Castillo"), Alfonso Giles, and Juan Giles; and an unindicted co-conspirator Sergio Garcia. Garcia's involvement with cocaine distribution preceded his relationship with Mendoza and his codefendants. Garcia's business came to a halt in February of 1990, however, when his supplier left town. One of Garcia's customers had been a neighbor of his in Chicago, Illinois, Castillo. When Garcia lost his cocaine source in February of 1990, Mendoza and his co-conspirators took the place of Garcia's previous supplier and put Garcia back in business.
 
 
 3
 At the time Garcia's cocaine dealing was interrupted, Castillo drove to California to visit his cousin Mendoza in a 1979 yellow Ford van that he purchased from Garcia. Garcia testified at trial that the van was not structurally altered at the time of sale. Sometime after Castillo's purchase of the van, it was altered to create hidden compartments to hide cocaine. During his visit with Mendoza, Castillo agreed to join Mendoza in the cocaine sale enterprise by agreeing to transport the drugs from California to Chicago.
 
 
 4
 In June 1990, Castillo called his supplier Garcia from California and told him that he would be delivering cocaine to Chicago. Castillo and Mendoza subsequently loaded nineteen kilograms of cocaine into the Ford van and inserted the cocaine in the van's hidden compartments. The defendants drove the van from Mendoza's Garden Grove, California, home to Alfonso Giles' house in Chicago and gave Alfonso Giles $1,000 to store the drugs in his garage.
 
 
 5
 Once in Chicago, Castillo telephoned Garcia and arranged a meeting at Castillo's house. During the meeting, Castillo and Mendoza told Garcia that they had brought a large amount of cocaine to Chicago and wanted to sell it for $26,000 a kilo, and asked Garcia how much he wanted. Later that day, Garcia advised Castillo that he had a buyer interested in twelve kilograms. Mendoza responded by telling Castillo to give Garcia all nineteen kilograms so that they would not have to bother with any other buyers. Garcia agreed and accepted the nineteen kilos.
 
 
 6
 Garcia met with Mendoza and Castillo at a Chicago intersection to accept the delivery of the cocaine. Mendoza and Castillo arrived at the designated location in Castillo's car. Garcia directed Mendoza and Castillo to follow him to his brother's house for the drug and money exchange. Upon arriving at Garcia's brother's house, Castillo drove the car into the garage, and Mendoza and Castillo joined him in the house. Once the three men were in the house, Castillo handed Garcia his car keys and told Garcia that the cocaine was in a box in the trunk of his car. Garcia gave the keys to his brother, who transferred the cocaine from the car trunk into the basement of his house. Castillo told Garcia that the purchase price for the nineteen kilograms was $494,000. At this time Garcia gave Castillo a check for $83,000; Castillo in turn gave the check to Mendoza. Garcia requested and Mendoza agreed to make full payment in two days.
 
 
 7
 Garcia sold fifteen kilograms of the cocaine in the next two days, and informed Castillo that he would make an additional payment. Garcia, Mendoza and Castillo again met at Garcia's brother's house, where Garcia gave Mendoza and Castillo $393,000 in cash. Garcia told Mendoza and Castillo that the payment was $19,000 short, but Mendoza suggested that he could pay the remaining amount in their next deal. Three days later, on June 21, 1990, Garcia and his brother delivered the previously promised four kilos of cocaine to another of Garcia's customers. Undercover law enforcement agents arrested Garcia and his brother immediately after the deal was completed.
 
 
 8
 Garcia was charged with delivery of a controlled substance and released from jail on bond on July 25, 1990. Two days after his release, Garcia received a message that Mendoza and Castillo wanted to see him concerning the $19,000 owed. Garcia met with Mendoza and Castillo at Castillo's home in Chicago and told them that he had been arrested. Mendoza suggested to Garcia that he continue selling cocaine to raise money to pay his drug debt. Mendoza told Garcia that after paying his debt, he could abscond the country or change his name and avoid imprisonment. Garcia met with Mendoza and Castillo again two days later, and Mendoza told Garcia that if he was reluctant to continue dealing in drugs, he should give Mendoza and Castillo his customers' names. Garcia agreed and gave them the name and telephone number of Rafael Hererra.
 
 
 9
 In July or August of 1990, Mendoza and Castillo prepared to transport a second load of cocaine from Mendoza's house in Garden Grove, California, to Chicago. Mendoza and Castillo loaded the thirteen kilos of cocaine into the Ford van and delivered it to Alfonso Giles' in Chicago. Once again, Mendoza and Castillo stored the van with the cocaine in Giles' garage and Mendoza gave Giles another $1,000 for use of the garage. At this time Mendoza and Castillo delivered five kilograms of cocaine to Rafael Hererra on consignment.
 
 
 10
 During a subsequent meeting between Garcia and Mendoza and Castillo, Castillo informed Garcia that Hererra had failed to make payment for the five kilos of cocaine. The parties met again on August 9, 1990, and Mendoza told Garcia that he was responsible for payment of the $19,000 that he owed from the first shipment as well as for the cocaine sold to Hererra in the second shipment. Mendoza made it clear that his California suppliers were irate over Garcia's failure to pay his debt. And Garcia replied that he did not have the money, but would give Mendoza his new Chevrolet van as payment. Mendoza and Garcia proceeded to Garcia's house, where Mendoza signed the car title over to Mendoza and gave him the keys. Before leaving, Mendoza told Garcia that he still owed him $84,000. The $84,000 debt consisted of the amount Garcia owed from the first shipment plus the amount Hererra owed from the second shipment, less the value of the Chevrolet van that Garcia had given to Mendoza. Approximately two days later, Mendoza again met with Garcia and reiterated that the California suppliers were getting desperate for the payment. Mendoza suggested that the suppliers would come to Chicago and talk to him directly. Mendoza threateningly added that they were aware that Garcia had a family. Garcia unsuccessfully attempted to persuade Mendoza to take his house as payment.
 
 
 11
 Garcia thereafter contacted his attorney and explained his predicament, and on August 16, 1990, contacted the government and agreed to cooperate in a drug investigation of Mendoza and Castillo. Garcia agreed to record telephone conversations with Mendoza and Castillo and further agreed to be wired with a transmitting device. On August 24, 1990, Garcia called Castillo in California and recorded the conversation. Garcia told Castillo that he was selling his house to get the necessary cash for his drug debt. Castillo stated that he would arrive in Chicago that week with a third shipment of cocaine. Garcia told Castillo to call him when he arrived and informed Castillo that he would be able to sell the drugs.
 
 
 12
 On August 26, 1990, Garcia recorded a telephone conversation with Mendoza. In response to Garcia's query as to when Mendoza would arrive in Chicago with the cocaine, Mendoza replied that he would know the next day the anticipated time of his arrival. Garcia recorded another phone conversation with Mendoza on September 13, 1990, during which Mendoza advised Garcia that the cocaine shipment would arrive in Chicago within three days. On September 13, 1990, a government agent conducting surveillance observed a man resembling Mendoza driving the Chevrolet van in Garden Grove, California.
 
 
 13
 Two days later on September 15, 1990, Mendoza and Castillo loaded twenty-four kilos of cocaine into the Chevrolet van. The Chevrolet van, like its predecessor Ford van, had been structurally altered and now had three hidden compartments for the cocaine. That same day, Castillo left Mendoza's house in California and drove the coke shipment to Chicago in the Chevrolet van, arriving in Chicago on the morning of the 17th of September 1990. As had been the practice, the van with the twenty-four kilogram cocaine shipment was again parked in Giles' garage.
 
 
 14
 The same day that Castillo arrived in Chicago with the cocaine, members of the City of Orange, California, Police Department secured Mendoza's house while they obtained a search warrant. The door to the house was open. Police officers entered the residence and announced that they were in the process of obtaining a search warrant. Mendoza was lying on a couch in the living room. While the police did a protective sweep of the house to determine if anyone else was present, Mendoza stated, "everything in the house is mine." Mendoza responded to a police officer's remark that he had seen two kilograms of cocaine in the back bedroom in plain view during the protective sweep with the remark that, "the two kilos in the bedroom are mine." A few minutes later, Connie Valdiva, who identified herself as Mendoza's wife, arrived at the house. After officers explained to her that the house had been secured while they were obtaining a search warrant, Valdiva stated that she "had no knowledge of what was going on." A police officer countered, "How could you not know there was a half a kilo in plain view in a Baggie [sic ] right on the dining room table?" Mendoza interrupted and stated, "No it's 250. I made it myself."
 
 
 15
 Later that day the officers executed their search warrant for the house and recovered two kilograms of cocaine lying on top of a bedroom dresser together with an additional 250 grams of cocaine. The police also found an INS immigration card bearing the name of Regino Gonzalez Castellon in the same bedroom where they discovered the cocaine. The officer who executed the warrant identified the picture on the INS card as Mendoza at an earlier age. The police also found a California driver instruction permit in the bedroom enscribed with the name of Regino Gonzalez Castellon.
 
 
 16
 On September 19, 1990, Garcia met with Castillo at Castillo's house at which time Castillo agreed to sell Garcia twenty-four kilos of cocaine for $25,000 a kilogram. Garcia also agreed to pay the $75,000 he owed from his first deal with Mendoza and Castillo and from the Hererra deal. The two men agreed to meet later in the day at 4:00 p.m. to exchange the drugs and money.
 
 
 17
 Castillo arrived at Alfonso Giles' house at approximately 3:30 p.m. that day to retrieve the cocaine from the compartments in the Chevrolet van. At this time Castillo and Alfonso Giles transferred the cocaine from the van and placed it in an ice chest. Castillo left the ice chest containing the cocaine in the garage when he left to meet Garcia.
 
 
 18
 Garcia arrived at the prearranged meeting place wearing two law enforcement transmitting devices. Castillo arrived shortly thereafter and signalled Garcia to follow him in his car. Garcia followed Castillo to Alfonso Giles' house, and, at Alfonso Giles' direction, drove to the rear of the house near the garage. Castillo, Alfonso Giles, and Juan Giles were standing near the garage waiting for Garcia. When Garcia joined them, their conversation was recorded over the transmitters. Juan Giles placed the ice chest containing the cocaine in the bed of Garcia's pickup truck, who then drove away from the house with Castillo following in his car.
 
 
 19
 Shortly thereafter, law enforcement agents stopped Garcia and Castillo and Castillo, Juan Giles, and Alfonso Giles were taken into custody. The ice chest containing the cocaine was retrieved by the arresting agents. Pursuant to a search warrant, the Chevrolet van located in the garage was searched and found to contain cocaine residue in the hidden compartments. A temporary Illinois Registration Permit was also found in the van, issued August 9, 1990, in the name of Regino C. Gonzalez.
 
 
 20
 On January 9, 1991, Customs agents found the yellow Ford van abandoned at the Mexican/United States border in the town of San Isidro, California. A California Transfer of Title relating to the Ford van was found that same day in Mendoza's house in Garden Grove, California.
 
 
 21
 After their arrest, Castillo, Alfonso Giles, Juan Giles, and Mendoza-Delgado were indicted and charged with a conspiracy existing from February through September 19, 1990. Telephone toll records revealed that from April 1990 to September 1990 seventy-seven telephone calls were made from Mendoza's Garden Grove, California house to Castillo's home or residence in Chicago. During this same time period, twenty-three phone calls were made between Mendoza's residence and Alfonso Giles' residence, as well as calls between Mendoza's house and Garcia's residence in Berwyn, Illinois. Calls were also recorded from Alfonso Giles' house and Castillo's house to Mendoza's house.
 
 
 22
 Mendoza and Juan Giles were jointly tried before a jury while Alfonso Giles proceeded with a simultaneous bench trial before the same court and was found not guilty. The jury found Mendoza guilty and Juan Giles was not guilty. Among the government's witnesses at trial were co-conspirators Garcia and Castillo. On October 3, 1991, the judge sentenced Mendoza to 420 months imprisonment. On October 18, 1991, the government moved the court to reconsider Mendoza's sentence. Because Mendoza had two prior felony narcotics convictions, the government argued and the court agreed and sentenced him to life imprisonment without parole, pursuant to 21 U.S.C. § 841(b)(1)(A).
 
 II. ISSUES
 
 23
 Mendoza-Delgado raises the following issues on appeal: (1) whether the evidence was sufficient to support his conviction on all three counts; (2) whether the double jeopardy clause of the Fifth Amendment prohibits his convictions under the conspiracy and both aiding and abetting counts; (3) whether the district court improperly admitted co-conspirator hearsay; (4) whether the district court abused its discretion in admitting testimony regarding the search of Mendoza's house; (5) whether the district court's jury instructions cured any error that may have resulted from a reference to the "Mendoza Organization"; (6) whether the district court erred in imposing the defendant's life sentence without reciting a statement of reasons; and (7) whether the defendant's sentence of life imprisonment without parole is cruel and unusual in violation of the Eighth Amendment.
 
 III. ANALYSIS
 A. SUFFICIENCY OF THE EVIDENCE
 
 24
 Mendoza asserts that the evidence submitted was insufficient to support his convictions of conspiracy to possess with intent to distribute and to distribute cocaine, aiding and abetting the possession with intent to distribute cocaine, and aiding and abetting a violation of the Travel Act. In addition to Mendoza's general challenge to the sufficiency of the evidence supporting his conviction on each count of the indictment, the defendant also alleges that (1) the acquittal of Juan and Alfonso Giles and Garcia and Castillo's plea to a lesser charge foreclosed a conspiracy finding; (2) Garcia and Castillo's testimony was so suspect that such evidence alone could not support his conviction; and (3) the evidence at trial established that more than one conspiracy was afoot and that the variance between the proof and the single conspiracy alleged in the indictment precluded his conspiracy conviction.
 
 
 25
 Mendoza has a substantial burden in challenging the sufficiency of the evidence. We will affirm a conviction if the evidence, when viewed in a light most favorable to the government, establishes that a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979); United States v. Van Wyhe, 965 F.2d 528, 531 (7th Cir.1992). As an appellate court we neither reweigh the evidence nor judge the credibility of witnesses, United States v. Gunning, 984 F.2d 1476, 1482 (7th Cir.1993); Van Wyhe, 965 F.2d at 531, and we draw all reasonable inferences in favor of the government. United States v. Curry, 977 F.2d 1042, 1053 (7th Cir.1992).
 
 1. The Conspiracy Charge
 
 26
 a. Evidence of Mendoza-Delgado's Participation
 
 
 27
 "A conspiracy is a combination or confederation between two or more persons formed for the purpose of committing a criminal act through their joint efforts." United States v. Lechuga, 994 F.2d 346, 353 (7th Cir.1993) (Coffey, J., concurring) (citing United States v. Lamon, 930 F.2d 1183, 1190 (7th Cir.1991)). To establish a conspiracy under 21 U.S.C. § 846, the government must demonstrate that two or more persons "knew of the illegal objective of the conspiracy alleged in the indictment, and agreed to participate in its achievement." Gunning, 984 F.2d at 1480; United States v. Burrell, 963 F.2d 976, 987 (7th Cir.), cert. denied, 113 S.Ct. 357 (1992); United States v. Navarez, 954 F.2d 1375, 1380 (7th Cir.1992). When a defendant challenges the sufficiency of the evidence connecting him to a conspiracy, we look for substantial evidence of his participation. United States v. Olson, 978 F.2d 1472, 1479 (7th Cir.1992) (quoting United States v. Durrive, 902 F.2d 1221, 1228 (7th Cir.1990)). A conspiracy conviction, however, may be based solely upon circumstantial evidence. United States v. Cea, 914 F.2d 881, 886 (7th Cir.1990).
 
 
 28
 The evidence in this case was clearly sufficient to establish Mendoza's participation in the conspiracy. Garcia and Castillo's testimony at trial established that on three occasions between June and September 1990, Mendoza joined Castillo and others in delivering fifty-six kilos of cocaine. Mendoza and Castillo delivered forty-three kilograms of cocaine to Garcia and five kilograms to Hererra. The witnesses failed to identify the buyer of eight of the thirteen kilograms delivered in the second shipment. Castillo and Garcia both testified as to Mendoza's major role in the cocaine distribution scheme.
 
 
 29
 Castillo testified that he agreed to participate with Mendoza in the cocaine distribution business between June and September of 1990. During that same time period, Castillo and Mendoza joined with one another on three occasions to transport cocaine from California to Chicago as well as arranging for the sale and distribution of the drugs upon arrival in Chicago. Castillo testified that Mendoza loaded the vans with the cocaine on each of the three occasions, and that the drugs were sold to Garcia after two of the deliveries and to Hererra on one occasion. Mendoza accompanied Castillo to Chicago on two of the trips.
 
 
 30
 Sergio Garcia and Juan Garcia also testified as to Mendoza's cocaine deliveries and sales to Sergio Garcia and Garcia's subsequent payment agreement. Sergio Garcia testified that he made payment to Mendoza for the cocaine with a check, cash, and a van. The government also presented evidence establishing that Mendoza owned the structurally altered vans and used them for the shipment of cocaine deliveries between his California home and Chicago, Illinois. Other evidence adduced at trial established that cocaine residue was found within the vans' hidden compartments.
 
 
 31
 Recorded telephone conversations between Mendoza and Garcia contained discussions concerning the purchase and delivery of cocaine. Furthermore, Castillo and Garcia testified that they had met with Mendoza on numerous occasions for the purpose of furthering the cocaine conspiracy. In sum, the evidence of the defendant's involvement in the conspiracy was overwhelming.
 
 
 32
 Mendoza argues that since Juan and Alfonso Giles were acquitted and Castillo pled to lesser charges, he had no one to conspire with; thus, his conspiracy conviction cannot stand. First, Castillo pleaded guilty to the conspiracy count in the indictment, which meant that contrary to Mendoza's representation, one of his alleged co-conspirators had been convicted of conspiring with Mendoza. At a minimum, as the evidence at trial clearly established and the jury found, Mendoza conspired with Castillo to distribute cocaine. Second, the acquittal of other defendants on the conspiracy charge has no direct bearing on Mendoza's individual guilty verdict. There is no presumption that the acquittal of one co-conspirator in a conspiratorial scheme bars a conviction of the remaining co-conspirator. See United States v. Mancari, 875 F.2d 103, 104 (7th Cir.1989), cert. denied, 111 S.Ct. 1320 (1991); see also United States v. Andrews, 850 F.2d 1557, 1561 (11th Cir.1988) (where all but one of charged co-conspirators acquitted, the verdict against the one may stand) (en banc), cert. denied, 488 U.S. 1032 (1989); United States v. Valles-Valencia, 823 F.2d 381, 382 (9th Cir.1987) (acquittal of all conspirators but one does not preclude conviction for conspiracy).
 
 
 33
 Mendoza also challenges the credibility of Castillo and Garcia as government witnesses. The defendant contends that the testimony of Castillo and Garcia was so suspect that no rational trier of fact could have convicted him based upon their testimony. "Their testimony was not, however, unbelievable on its face; accordingly, such arguments are for the trier of fact and not a reviewing court." Gunning, 984 F.2d at 1481 (citing United States v. Van Wyhe, 965 F.2d 528, 531 (7th Cir.1992)). Mendoza's attack on the witnesses' credibility ignores that credibility determinations are for the jury alone; that Castillo and Garcia's testimony was corroborated by other evidence direct and circumstantial, including recorded telephone conversations involving Garcia, Castillo, and Mendoza; surveillance testimony of law enforcement agents; cocaine residue found in Mendoza's vans used to transport cocaine; the cocaine discovered in Mendoza's home during the September 1990 search; and Mendoza's inculpatory statements to police officers after they entered his home prior to the search.
 
 
 34
 b. Multiple Conspiracy Challenge
 
 
 35
 Finally, Mendoza asserts that the evidence fell short of supporting a single conspiracy finding; rather, he argues it indicated his participation in several unrelated drug conspiracies. Mendoza asserts, without reference to the record, that "there were at least three or four separate conspiracies at work." In United States v. Townsend, 924 F.2d 1385 (7th Cir.1991), we stated that
 
 
 36
 the crime of conspiracy focuses on agreements, not groups. True, it takes at least two to conspire, but the government doesn't have to prove with whom a defendant conspired; it need only prove that the defendant joined the agreement alleged, not the group.... So to overturn a conspiracy conviction on the ground of variance, an appellant must show both that he did not conspire with each defendant and that he was prejudiced by being tried with defendants who were not his co-conspirators.
 
 
 37
 Id. at 1389-90. "If there is one overall agreement among various partners to perform different functions in order to carry out the objectives of the conspiracy, the agreement constitutes a single conspiracy." United States v. Gonzalez, 933 F.2d 417, 437 (7th Cir.1991). By contrast, if each of the conspirators' agreements has its own end or is an end in itself, then multiple conspiracies exist. Curry, 977 F.2d at 1052; United States v. Paiz, 905 F.2d 1014, 1020 (7th Cir.1990), cert. denied, 111 S.Ct. 1319 (1991). Whether there is one conspiracy or several is a question of fact for the jury. Id. at 1019. We will uphold a conviction if, when viewing the evidence in the light most favorable to the government, "a reasonable trier of fact could have found beyond a reasonable doubt the existence of the single conspiracy charged in the indictment." Townsend, 924 F.2d at 1389. If a reasonable trier of fact could have found that there was a single conspiracy, we will affirm even if the evidence at trial was also consistent with a finding that multiple conspiracies existed. Id.
 
 In Gonzalez, we observed:
 
 38
 "The government may establish a defendant's knowing participation in a single conspiracy by offering evidence that:
 
 
 39
 'the parties to the agreement were aware that others were participating in the scheme. The co-conspirators must have "knowingly embraced a common criminal objective.' ... However, there is no requirement that the participants in the plan "personally know the individuals involved ... [a]s long as the conspiracy continues in its goals to achieve a common objective." '
 
 
 40
 United States v. Boucher, 796 F.2d 972, 975 (7th Cir.1986) (citations omitted). In other words, the government may establish that a defendant knowingly became a member of a single narcotics conspiracy ' "if each [defendant retailer] knew or had reason to know, that other retailers were involved with the ... organization in a broad project for smuggling, distribution and retail sale of narcotics, and had reason to believe that their own benefits derived from the operation were probably dependent upon the success of the entire venture ..." ' United States v. Cerro, 775 F.2d 908, 911 (7th Cir.1985) (citations omitted)."
 
 
 41
 Gonzalez, 933 F.2d at 439 (quoting United States v. Briscoe, 896 F.2d 1476, 1505 (7th Cir.1990)); see also United States v. Varelli, 407 F.2d 735, 742 (7th Cir.1969) ("The distinction must be made between separate conspiracies, where certain parties are common to all and one overall continuing conspiracy with various parties joining and terminating their relationship at various times. Various people knowingly joining together in furtherance of a common design or purpose constitute a single conspiracy.").
 
 
 42
 The district court instructed the jury on the elements required to find that a single conspiracy had been established. The jury was also instructed that unless it found the existence of the single overall conspiracy described in the indictment beyond a reasonable doubt, it was obliged to acquit Mendoza. The jury determined that the evidence established Mendoza's participation in the single conspiracy alleged in the indictment. Because we have determined that the evidence was sufficient to support Mendoza's conviction for the conspiracy, we need not discuss Mendoza's allegation that multiple conspiracies were proved rather than an ongoing conspiracy. United States v. Aguilar, 948 F.2d 392, 396 n. 6 (7th Cir.1991); Townsend, 924 F.2d 1385, 1389 (7th Cir.1991).
 
 
 43
 2. Aiding and Abetting Possession with the Intent to
 
 Distribute Cocaine
 
 44
 Mendoza challenges the sufficiency of the evidence supporting his conviction for aiding and abetting Castillo and others in possessing twenty-four kilos of cocaine on September 19, 1990, with the intent to distribute. Specifically, Mendoza asserts that the evidence did not prove that he was ever in actual or constructive possession of the cocaine.
 
 
 45
 To support a finding that Mendoza aided and abetted Castillo and others in possessing cocaine with the intent to distribute, the evidence must establish that Mendoza "in some sort associate[d] himself with the venture, that he participate[d] in it as in something he wishe[d] to bring about, [and] that he s[ought] by his action to make it succeed." United States v. Pino-Perez, 870 F.2d 1230, 1235 (7th Cir.) (en banc), cert. denied, 493 U.S. 901 (1989); United States v. Gonzalez, 933 F.2d 417, 443 (7th Cir.1991) (quoting United States v. Valencia, 907 F.2d 671, 677 (7th Cir.1990)). The government must establish Mendoza's association with the venture by proving that he had the state of mind required for the statutory offense. Valencia, 907 F.2d at 677. To establish participation in a conspiracy, a high level of activity need not be shown; rather, the evidence must demonstrate that the defendant engaged in some affirmative conduct or act designed to aid in the venture's success. Id.
 
 
 46
 The evidence clearly satisfied the participation and association elements of the aiding and abetting offense, which concerned the third and final transport of cocaine to Chicago. Included in the evidence presented by the government were (1) two telephone conversations recorded on August 26, 1990, and September 13, 1990, in which Mendoza discussed with Garcia the delivery of twenty-four kilograms of cocaine to Garcia in Chicago; (2) Castillo's testimony that on September 15, 1990, Mendoza helped him load the twenty-four kilos of cocaine, which belonged to Mendoza, into Mendoza's van; and (3) Castillo's testimony that, according to Mendoza's plan, Castillo transported the cocaine contained in the van's compartments to Garcia in Chicago, Illinois, September 19, 1990. Mendoza's claim that he never possessed the cocaine, while clearly contradicted by the evidence at trial, is irrelevant because the evidence need not establish that a defendant had actual or constructive possession of drugs to support a conviction of aiding and abetting the possession of drugs with intent to distribute. United States v. McNeese, 901 F.2d 585, 609 (7th Cir.1990); Wesson, 889 F.2d at 135.
 
 
 47
 3. Aiding and Abetting a Violation of the Travel Act
 
 
 48
 Mendoza also asserts that the evidence was insufficient to support his conviction under Count II for aiding and abetting Castillo's interstate travel to distribute cocaine on September 15, 1990. See 18 U.S.C. § 1952. Mendoza initially argues that although the testimony of Castillo and Garcia was incriminating, they were not credible witnesses because of their obvious motive to fabricate testimony to diminish their involvement. We have previously ruled that a rational trier of fact could have convicted Mendoza based upon Castillo and Garcia's testimony; thus, we will not disturb the jury's credibility determinations. Second, Mendoza argues that the evidence was insufficient to show a continuous course of conduct, as is required to establish a "business enterprise" under the Travel Act.
 
 
 49
 To establish a Travel Act violation, the government must establish that a defendant traveled in interstate commerce, with the intent to promote, manage, establish, or carry on any unlawful activity. 18 U.S.C. § 1952(a).[1] The Travel Act defines one instance of "unlawful activity" as "any business enterprise involving ... narcotics or controlled substances...." 18 U.S.C. § 1952(b)(1). To sustain a conviction for aiding and abetting, the evidence must demonstrate that Mendoza had the state of mind required for the Travel Act offense and that he engaged in some affirmative conduct or act designed to aid in the venture's success. Valencia, 907 F.2d at 677.
 
 
 50
 The testimony of Garcia, Castillo, and agents conducting surveillance was more than sufficient to establish that the twenty-four kilos of cocaine that Castillo delivered to Chicago on September 15, 1990, and delivered to Garcia, belonged to Mendoza, that the van used to transport the drugs was Mendoza's, and further that Mendoza assisted Castillo in loading the drugs into the van prior to Castillo's departure for Chicago. During the recorded telephone conversations on August 26, 1990, and September 13, 1990, Mendoza discussed with Garcia the impending drug delivery from Mendoza's Garden City, California, home to Chicago. Contrary to Mendoza's claim of nonparticipation, the evidence that he intentionally assisted in the distribution of cocaine through interstate travel was substantial.
 
 
 51
 Evidence of a "business enterprise" within the meaning of the Travel Act requires "more than isolated, casual, or sporadic activity." United States v. Muskovsky, 863 F.2d 1319, 1327 (7th Cir.1988), cert. denied, 489 U.S. 1067 (1989). "Rather, to be a business enterprise, the activities must be part of a 'continuous course of conduct.' " Id. (quoting United States v. Corbin, 662 F.2d 1066, 1072 (4th Cir.1981)). The evidence adduced at trial established that the activities alleged in the Travel Act count were part of a continuous course of conduct and conspiracy to distribute cocaine. The evidence demonstrated that between June and September of 1990 approximately fifty-six kilograms of cocaine were transported between California and Chicago in the course of three trips in two vans that had been structurally altered to conceal cocaine. Mendoza provided all of the cocaine for the enterprise, and in fact drove two of the shipments to Chicago while arranging for the delivery of the cocaine to buyers on each of the three occasions. The illegal activity that Mendoza engaged in was neither an isolated nor a sporadic event, but rather a continuous course of conduct as required for proof of a business enterprise under the Travel Act.
 
 B. DOUBLE JEOPARDY
 
 52
 Mendoza argues that his conviction on both the conspiracy count and the aiding and abetting counts violates the double jeopardy clause of the Fifth Amendment. In United States v. Sidener, 876 F.2d 1334, 1336-37 (7th Cir.1989), we rejected this same contention, finding that "[c]onspiracy and aiding and abetting require proof of a fact not common to each other and are separate punishable offenses." See also United States v. Zafiro, 945 F.2d 881, 887-88 (7th Cir.1991) (same). Our holding in Sidener nullifies Mendoza's double jeopardy argument.
 
 C. CO-CONSPIRATOR HEARSAY
 
 53
 Mendoza asserts that the district court erred by admitting portions of Castillo's and Garcia's testimony concerning his out-of-court statements. The defendant maintains that the government would be unable to prove his participation in the conspiracy without the erroneously admitted co-conspirator hearsay.
 
 
 54
 To the extent Mendoza is challenging the admission of Garcia and Castillo's testimony concerning his own statements and actions, the co-conspirator hearsay rule is not implicated. "Co-conspirator testimony about the words and deeds of a defendant are not hearsay; the words and deeds of the defendant, while themselves out-of-court statements, are admissions, and because the testimony is offered in court, the statements of the co-conspirator are not hearsay either." United States v. Thompson, 944 F.2d 1331, 1341 (7th Cir.1991), cert. denied, 112 S.Ct. 1177 (1992); United States v. Maholias, 985 F.2d 869, 877 (7th Cir.1993) (quoting Thompson, 944 F.2d at 1341). Garcia's and Castillo's testimony regarding Mendoza's words and deeds was more than sufficient to establish his participation in a conspiracy.
 
 
 55
 Mendoza's generalized argument could be construed as a challenge to the admission of evidence of out-of-court conversations that Garcia and Castillo had with each other and co-conspirators other than Mendoza. We note that defense counsel failed to object to the admission of Garcia and Castillo's testimony at trial on the ground that it was improperly admitted as co-conspirator hearsay. By failing to raise this issue before the district court, Mendoza has waived the issue on appeal. Maholias, 985 F.2d at 877; United States v. Livingston, 936 F.2d 333, 335 (7th Cir.1991), cert. denied, 112 S.Ct. 884 (1992). Thus, we review for plain error, and will reverse only if the error was "of such a great magnitude that it probably changed the outcome of the trial." United States v. Douglas, 818 F.2d 1317, 1320 (7th Cir.1987); Fed.R.Civ.P. 52(b).
 
 
 56
 Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that, "a statement of a party during the course and in furtherance of the conspiracy" is not hearsay. "To admit a witness's statement under this Rule, the government must demonstrate, by a preponderance of the evidence, that (1) a conspiracy existed, (2) the declarant and defendant were members of the conspiracy, and (3) the statement was made in furtherance of the conspiracy." Maholias, 985 F.2d at 878 (citing United States v. Romo, 914 F.2d 889, 896 (7th Cir.1990), cert. denied, 111 S.Ct. 1078 (1991)). "[A] court, in making a preliminary factual determination under Rule 801(d)(2)(E) may examine the hearsay statements sought to be admitted." Bourjaily v. United States, 483 U.S. 1171, 181 (1987).
 
 
 57
 Mendoza's claim that the district court's failure to expressly find that there was independent proof of a conspiracy precluded use of co-conspirator hearsay is unfounded. We noted in United States v. Nicosia, 638 F.2d 970 (7th Cir.1980), cert. denied, 452 U.S. 961 (1981), that our decision in United States v. Santiago, 582 F.2d 1128 (7th Cir.1978), does not require a district court to make specific findings concerning the existence of a conspiracy as a "necessary predicate for admission of such co-conspirator's statements." Id. at 974. Nonetheless, we admonished district courts that "the record entry of such a finding is the better practice and exercise for the district court to follow when confronted with an objection to or motion to strike a co-conspirator's testimony relating to out-of-court statements...." Id. We concluded that the district court's failure to make such a specific finding was at most harmless error. Id.; see also United States v. Serola, 767 F.2d 364, 372 (7th Cir.1985). As we noted earlier, Mendoza did not object to Garcia and Castillo's testimony on the ground that it was improperly admitted as co-conspirator hearsay. The record in the case contains more than abundant independent evidence of Mendoza's participation in the conspiracy. Under such circumstances, we are convinced that the trial court did not commit reversible error in admitting co-conspirator hearsay.
 
 
 58
 D. TESTIMONY REGARDING THE SEARCH OF MENDOZA'S HOUSE
 
 
 59
 Mendoza also contends that the district court erred in admitting evidence of the two kilograms of cocaine recovered during the search of his residence, as well as his inculpatory statements when the police were present in his home prior to the execution of the search warrant. Mendoza claims that the testimony concerning the search and his spontaneous statements to police were evidence of other crimes wrongs, or acts that are excluded under Fed.R.Evid. 404(b) when used to prove the character of a defendant. The government asserts that Rule 404(b) does not apply because the evidence obtained from the search was "intricately related" to the crimes charged. See United States v. Monzon, 869 F.2d 338, 343 (7th Cir.), cert. denied, 490 U.S. 1075 (1989). Alternatively, Mendoza argues that the evidence was not relevant under Rule 402 and, if relevant, its relevance was outweighed by its prejudicial effect under Rule 403.
 
 
 60
 Mendoza failed to object to the testimony at trial on Rule 404(b) grounds. Because defense counsel failed to raise Rule 404(b) as a possible bar to the testimony concerning the search of his house, the objection was waived on appeal unless the admission was plain error. United States v. Wynn, 845 F.2d 1439, 1443 (7th Cir.1988). We will find plain error only if the defendant demonstrates that he "probably would have been acquitted but for the erroneously admitted evidence"; in sum, if an " 'actual miscarriage of justice' " thereby resulted. Id. (quoting United States v. Silverstein, 732 F.2d 1338, 1349 (7th Cir.1984), cert. denied, 469 U.S. 111 (1985)).
 
 
 61
 We agree with the government that the discovery of a large amount of cocaine in Mendoza's home and Mendoza's inculpatory statements establishing that the drugs were in his control was "directly relevant to the crimes charged." United States v. Hawkins, 823 F.2d 1020, 1023 (7th Cir.1987). Therefore, "we need only analyze this evidence under Rule 403, and decide whether the prejudicial aspects of [the testimony] outweighed its probative value." Id.; see also Monzon, 869 F.2d at 343 ("[E]vidence of other acts or crimes which are 'intricately related to the facts of the case' are admissible without reference to Rule 404(b) so long as the probative value of the evidence outweighs its prejudicial effect.")
 
 
 62
 The testimony regarding Mendoza's arrest on September 17, 1990, the contemporaneous seizure of two kilos of cocaine from his home, and his admissions to the arresting officers all corroborated Castillo's testimony that Mendoza was the source of the cocaine ultimately delivered to Garcia and Hererra. Castillo testified that two days prior to Mendoza's arrest he had picked up twenty-four kilograms from Mendoza's house for delivery to Garcia. Several times during cross-examination of the government's witnesses, Mendoza's counsel attempted to present a defense theory that the drugs were not picked up at Mendoza's home. Rather, Mendoza maintained that Castillo secured the drugs en route in Texas during the trips between California and Chicago. Evidence that a substantial quantity of cocaine was found in Mendoza's house, and Mendoza's admission that the drugs belonged to him, was indisputably relevant because it demonstrated that he possessed the drug that he was accused of conspiring to distribute during the existence of the conspiracy. The probative value of this evidence far outweighed any possible prejudicial effect. Thus, we hold that the district court properly admitted the evidence obtained during the search of Mendoza's home.
 
 
 63
 E. REFERENCE TO THE "MENDOZA ORGANIZATION"
 
 
 64
 Mendoza next seeks reversal of his conviction on the ground that he was unfairly prejudiced by a government witness' single reference to the "Mendoza organization." As a preliminary question on direct examination, the prosecution asked whether the witness, DEA Special Agent Rafael Tovar, was "working with respect to any particular investigation." Tovar replied that he "was doing follow-up and gathering more information on the Mendoza organization." Defense counsel immediately objected to Tovar's answer. The district court sustained the objection and stated: "I have already instructed the jury that they are to disregard matters where objections are sustained." Mendoza asserts that the court's admonishment was insufficient to negate the prejudicial effect of Tovar's remark.
 
 
 65
 The remark Mendoza directs us to occurred once in the course of a six-day trial. The first time during the trial that the district court sustained an objection, the court instructed the jury that it was "admonished generally to disregard ... any statement made to which an objection has been sustained." Immediately after sustaining the objection to Tovar's remark, the court reminded the jury that they were obliged to disregard any comment to which an objection had been sustained. Finally, the court once again instructed the jury at the conclusion of Mendoza's trial that it was "to disregard any evidence to which [the court] sustained an objection." In light of the slight or very limited impact that this single reference might have had on the outcome of the trial and the district court's solicitude in curing any prejudice that could have ensued, we reject Mendoza's suggestion that we reverse his conviction. See United States v. Caliendo, 910 F.2d 429, 436 (7th Cir.1990) (reference to defendant's membership in "the outfit" cured by court's instruction that jury should disregard the comment); United States v. DeSoto, 885 F.2d 354, 361-62 (7th Cir.1989) (no reversible error where witness characterized activities inside building as "dope deals" when court ordered the comment stricken and the jury instructed to disregard the comment); United States v. Swiatek, 819 F.2d 721, 730 (7th Cir.), cert. denied, 484 U.S. 903 (1987). A single inadvertent reference during a six-day trial to the "Mendoza organization" is insufficient grounds for overturning Mendoza's conviction.
 
 F. SENTENCING CHALLENGES
 
 66
 Finally, Mendoza challenges his sentence of mandatory life imprisonment on the grounds that the trial court did not state its reasons for imposing the sentence. Second, Mendoza alleges that his life sentence violates the Eighth Amendment's ban on cruel and unusual punishment.
 
 
 67
 At Mendoza's original sentencing hearing the government argued that the defendant should be sentenced to life imprisonment pursuant to 21 U.S.C. § 841(b)(1) because Mendoza had two prior felony convictions for narcotics offenses.[2] Notwithstanding Mendoza's two prior felony narcotics convictions and § 841(b)(1)'s requirement of a mandatory life sentence, the district court sentenced Mendoza to 420 months imprisonment. Mendoza filed a notice of appeal on October 4, 1991. On October 18, 1991, the government filed a motion for reconsideration of Mendoza's sentence, reminding the district court that § 841(b)(1) mandated that a district court impose a life sentence on defendants such as Mendoza who have two prior felony convictions for narcotics offenses. On December 19, 1991, the district court modified its judgment and changed Mendoza's sentence from 420 months imprisonment to life imprisonment without release pursuant to 21 U.S.C. § 841(b)(1). Mendoza filed a second notice of appeal on December 19, 1991.[3]
 
 
 68
 Mendoza's claim that the district court failed to articulate a reason for changing his sentence to life imprisonment is inaccurate. The court's order modifying Mendoza's sentence stated that the sentence was changed "[f]or the reasons set forth in the government's motion and in open court" at the hearing on the government's motion for reconsideration of Mendoza's sentence. At the December 19, 1991, hearing on the government's motion, the district court noted that § 841(b)(1) mandated a life sentence and gave the court "little discretion other than to hold the statute unconstitutional." The court found that based upon Mendoza's prior criminal convictions and the offense he was convicted of in this case, a sentence of life imprisonment was required. The district court correctly ruled that the statutory enhancement penalty of a life sentence was mandatory.[4]
 
 
 69
 Mendoza's contention that his life sentence under 21 U.S.C. § 841(b)(1)(A) violates the Eighth Amendment's prohibition against cruel and unusual punishment is without merit. See Harmelin v. Michigan, 111 S.Ct. 2680, 2701-02 (1991) (mandatory sentence of life imprisonment without parole for possession of more than 650 grams of cocaine was not cruel and unusual in violation of Eighth Amendment); Rummel v. Estelle, 445 U.S. 263 (1980) (life sentence without parole for three relatively minor non-violent felonies not Eighth Amendment violation); United States v. Kramer, 955 F.2d 479, 488 (7th Cir.) (mandatory life sentence without parole under 21 U.S.C. § 848(b) not cruel and unusual punishment), cert. denied, 113 S.Ct. 595 (1992); United States v. Mergerson, No. 92-1179, slip op. at 15-16 (5th Cir. July 12, 1993) (mandatory life sentence under 21 U.S.C. § 841(b)(1)(A) not cruel and unusual punishment); United States v. Willis, 956 F.2d 248, 251 (11th Cir.1992) (same) (per curiam); United States v. Van Winrow, 951 F.2d 1069, 1071 (9th Cir.1991) (same) (per curiam); United States v. Harvey, 946 F.2d 1375, 1378 (8th Cir.1991) (same).
 
 IV. CONCLUSION
 
 70
 The defendant's conviction and sentence are AFFIRMED.
 
 
 
 [1]
 Section 1952(a) states, in its entirety:
 Whoever travels in interstate or foreign commerce or uses any facility in interstate of foreign commerce, including the mail, with intent to--
 (1) distribute the proceeds of any unlawful activity; or
 (2) commit any crime of violence to further any unlawful activity; or
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
 and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
 18 U.S.C. § 1952(a).
 
 
 [2]
 Section 841(b) provides, in pertinent part:
 If any person commits a violation of this subparagraph or of section 859, 860, or 861 of this title after two or more prior convictions for a felony drug offense have become final, such a person shall be sentenced to a mandatory term of life imprisonment without release and fined in accordance with the preceding sentence.
 21 U.S.C. § 841(b).
 
 
 [3]
 In United States v. Himsel, 951 F.2d 144 (7th Cir.1991), we noted that before 1987, Rule 35(a) of the Federal Rules of Criminal Procedure expressly provided that a district court could "correct an illegal sentence at any time." Id. at 146. The provision giving district courts broad authority to correct illegal sentences, however, was dropped from the version of Rule 35(a) applicable to the defendant in Himsel and to Mendoza. Id. Nonetheless, we held that "notwithstanding the present wording of the rule, [district courts] have an inherent authority to correct illegal sentences." Id. at 146-47. Mendoza's sentence was illegal because § 841(b)(1) required the district court to impose a life sentence. Thus, the district court had inherent authority to reconsider Mendoza's sentence
 Subsection c of the current version of Rule 35, which became effective approximately two months after Mendoza was sentenced, requires a district court to correct its errors within seven days of sentencing. See Fed.R.Crim.P. 35(c) ("The court, acting within 7 days after the imposition of sentence, may correct a sentence that was imposed as a result of arithmetical, technical, or other clear error."); see also Scott v. United States, No. 91-3413, slip op. at 2-3 (7th Cir. June 29, 1993) (Under current Rule 35(c) "[o]nce seven days have run, sentences said to be illegal or improvident or just plain too long are beyond the power of the district court to modify.").
 
 
 [4]
 In addition to his challenge to the district court's reasons for imposing the life sentence, the defendant has raised several inapposite challenges to the district court's Sentencing Guidelines calculations, claiming that he was entitled to a two-point reduction for acceptance of responsibility and that the government should be required to prove the amount of cocaine involved in his offense despite defense counsel's stipulation to the amount. These claims are without merit. The Sentencing Guidelines provide that where a "statutorily required minimum sentence is greater than the maximum of the applicable guideline range, the statutorily required minimum sentence shall be the guideline sentence." U.S.S.G. § 5G1.1(b). Mendoza's statutory minimum sentence under 21 U.S.C. § 841(b)(1) was life imprisonment without parole, thus his guideline sentence could not be anything other than life imprisonment